BISHOP TRUST COMPANY, LIMITED AND SAM-
UEL W. WILCOX, EXECUTORS OF THE ESTATE
OF ELSIE HART WILCOX *v.* EDWARD J. BURNS,
DIRECTOR OF TAXATION OF THE STATE OF
HAWAII.

No. 4173.

MARCH 25, 1963.

TSUKIYAMA, C.J., CASSIDY, WIRTZ, JJ., CIRCUIT JUDGE
HEWITT, IN PLACE OF LEWIS, J., DISQUALIFIED,
AND CIRCUIT JUDGE TASHIRO, IN PLACE OF
MIZUHA, J., DISQUALIFIED.

OPINION OF THE COURT BY WIRTZ, J.

This case involves the liability for inheritance taxes under R.L.H. 1945, Chapter 103, as amended (now R.L.H. 1955, Chapter 122[1]), on account of the transfer hereinafter outlined. On January 7, 1960, the parties to this proceeding filed in this court, pursuant to R.L.H. 1955,

---

[1] Elsie H. Wilcox died on June 30, 1954, and the assessment in controversy in this case was made under the Revised Laws of Hawaii 1945.

§ 227-1[2], an Agreed Statement of Facts and requested this court to determine the question in difference. This statement set out, in substance, the following facts:

On February 21, 1938, Elsie H. Wilcox transferred certain shares of stock to Bishop Trust Company, Limited, as trustee, under an instrument which directed the trustee to pay the net income of the trust to the "Elsie H. Wilcox Foundation," a charitable trust, for and during her lifetime, and from and after her death to pay the net income, in equal shares, to certain named nephews and nieces or their lawful surviving issue, and upon default of issue, to the surviving nephews and nieces and their lawful surviving issue. The trust was to terminate twenty years after the death of the last survivor of the named nephews and nieces and at that time the trust property, together with all accumulated income, was to be distributed to the persons who were then entitled to the income of the trust. In the event, however, that all of the surviving issue of the named nephews and nieces should die prior to the expiration of the twenty year period, the trust would cease upon the death of the last of such surviving issue and the trust property would pass to those persons who would be the heirs at law of Miss Wilcox as if she had died intestate at that time. It was further provided that the settlor "shall have no power to revoke this Trust, nor to amend or alter the provisions hereof."

Previously, the charitable trust known as the "Elsie H. Wilcox Foundation" had been created by Miss Wilcox

---

[2] R.L.H. 1955, § 227-1:

*"To supreme court; affidavit.* Parties to a question in difference which might be the subject of a civil action in the tax appeal court, circuit court or supreme court may, without action, agree upon a case containing the facts upon which a controversy depends and present a submission of the same to the supreme court; but it must appear by affidavit that the controversy is real and the proceedings in good faith to determine the rights of the parties; provided, that the supreme court may, in its discretion, require the case to be first submitted to a circuit judge at chambers subject to appeal."

on February 15, 1938, by deed of trust which provided that the trust was organized and was to be operated "exclusively for religious, charitable, scientific, literary or educational purposes, or for the prevention of cruelty to children or animals," and that "no part of the net earnings of this trust shall inure to the benefit of any private shareholder or individual." The trust could not be "changed, amended or modified at any time * * * to prevent the application of the entire net income and principal of any of the property now or hereafter becoming subject to this trust from being applied and used solely for public charities[3] * * *."

After the death of Elsie H. Wilcox on June 30, 1954, the plaintiffs were duly appointed executors of her estate. Thereafter, the defendant[4] assessed against the plaintiffs under R.L.H. 1945, § 5552, as amended (now R.L.H. 1955, § 122-2), and R.L.H. 1945, § 5556 (now R.L.H. 1955, § 122-6[5]), on account of the property transferred under the trust indenture of February 21, 1938, additional in-

[3] Miss Wilcox, however, did reserve the complete power to determine the uses and purposes for which the trust income or principal might be applied, the amount or proportion thereof to be so used or paid to other charitable organizations coming within the scope of the foundation, and to determine and regulate the accumulation of income. This reserved power, however, is not considered to be material to the determination of the question in difference, as the case is considered on the theory of the plaintiffs "that the settlor irrevocably divested herself of all title, possession and enjoyment of the property which was transferred in trust" and the defendant does not contest this position by his assertion that the statute does not require the retention of a substantial beneficial interest in the property by the transferor during his lifetime in order to render the transfer taxable.

[4] This case was submitted on the agreed statement of facts on January 7, 1960, on which filing date Earl W. Fase was Tax Commissioner of the State of Hawaii. On the day following, January 8, 1960, the Office of the Tax Commissioner was redesignated the Department of Taxation, under Executive Order No. 4 issued by the Governor of Hawaii, and Mr. Fase was appointed the director thereof. Thereafter, Edward J. Burns succeeded Mr. Fase in office and by stipulation between the parties, filed herein on February 27, 1963, was substituted as the defendant in this proceeding in the place of Earl W. Fase.

[5] This section deals with the imposition of the tax on contingent interests and is not the subject of this litigation.

heritance taxes and interest in the aggregate sum of $14,606.37 based on a valuation of the trust property of $238,490.51 and distributed according to law and the trust indenture among the heirs and legatees. The plaintiffs paid the amount of such additional inheritance taxes in the amount assessed, together with interest thereon, in the total amount of $14,606.37[6]. This amount was paid on June 7, 1956, to the defendant under an escrow agreement by the terms of which the defendant[7] agreed to hold the amount of the disputed taxes pending the determination of the controversy and to pay it over in accordance with the judgment entered by this court.

It is the contention of the defendant, under the submission, that R.L.H. 1945, § 5552, as amended (now R.L.H. 1955, § 122-2), "compels the imposition of the tax assessed on the ground that the entrusted property or an interest in or income therefrom was transferred by the said trust indenture of February 21, 1938 to the respective remaindermen, intended to take effect in possession or enjoyment after the death of the donor." On the other hand, the contention of the plaintiffs is "that the entrusted property is not subject to the taxes imposed by Section 5552 because the transfer irrevocably divested the settlor of all right, title and interest in the property, and the transfer was not 'intended to take effect in possession or enjoyment after such death' within the meaning of the statute."

Under these contentions the question in difference as

[6] Under related provisions of R.L.H. 1945, Chapter 103, as amended (now R.L.H. 1955, Chapter 122), the personal representatives of the deceased are required to file the inheritance tax return and are jointly liable with the beneficiaries for the tax, which is also a lien on the property transferred. The estate cannot be distributed or closed, nor the representatives discharged from their fiduciary duties, until the tax has been paid. The tax, however, is collectible by the representatives from the beneficiaries, who are actually the object of the tax assessed and ultimately bear its burden.

[7] See footnote 4. Under the stipulation of February 27, 1963, Edward J. Burns was "fully substituted in place of said EARL W. FASE as a party to the escrow agreement dated June 7, 1956, * * *."

submitted is "whether the property entrusted under the terms and conditions of the aforementioned trust indenture of February 21, 1938 is subject to inheritance taxes imposed by Section 5552, Revised Laws of Hawaii 1945, as amended, (now Section 122-2, Revised Laws of Hawaii 1955), * * *."

The pertinent portion of R.L.H. 1945, § 5552, as amended (now R.L.H. 1955 § 122-2), provides:

"Sec. 5552. *Tax imposed when, generally.* All property which shall pass by will or by the intestate laws of the Territory, from any person who may die seized or possessed of the same while a resident of the Territory, or which, being within the Territory, shall pass, whether by the laws of the Territory or otherwise, from any person who may so die while not a resident of the Territory, or which or any interest in or income from which, shall be transferred by deed, grant, sale or gift, made in contemplation of the death of the grantor, vendor, or bargainer, or intended to take effect in possession or enjoyment after such death, to any person or persons, or to any body politic or corporate, in trust or otherwise, or by reason whereof any person or body politic or corporate shall become beneficially entitled, in possession or expectancy, to any property, or to the income thereof, shall be and is subject to a tax hereinafter provided for, to be paid to the tax commissioner of the Territory, as hereinafter directed, for the use of the Territory; * * *."

The above quoted language of R.L.H. 1945, § 5552, as amended (now R.L.H. 1955, § 122-2), with only one substantial change made in 1909[8], is found in the first para-

---

[8] Act 147, S.L.H. 1909, inserted the words "whether by the laws of this Territory or otherwise" at the place they are now found in R.L.H. 1945, § 5552, as amended, and the word "so" previously present before the word "pass" immediately preceding the foregoing insertion was deleted. All other changes up to and including the 1955 revision of the laws of the Territory of Hawaii relate only to form and style.

graph of Section 1 of Act 102, S.L.H. 1905, enacted by the legislature of the Territory of Hawaii at its regular session in 1905, which Act fathered the present inheritance tax.

This language of R.L.H. 1945, § 5552, as amended (now R.L.H. 1955, § 122-2), now before us for consideration as to the applicability of the questioned tax to the instant transfer, was first considered by this court in 1910, which stated that "the act is not open to construction and does not by any way of looking at it, without ignoring its clearly expressed provisions, require that only such property be taxed as passes by will or descent or by transfer from one dying seized or possessed of it." *Brown* v. *Treasurer,* 20 Haw. 41, 44.

The above quoted pertinent language of the statute is readily susceptible to the following classification of taxable transfers of:

"All property (1) *which* shall pass by will or by the intestate laws of the Territory, *from any person who may die seized or possessed of the same* while a resident of the Territory, or (2) which, being within the Territory, shall pass, whether by the laws of the Territory or otherwise, from any person who may *so die* while not a resident of the Territory, or (3) *which* or any interest in or income from *which,* shall be transferred by deed, grant, sale or gift, (a) made in contemplation of the death of the grantor, vendor, or bargainer, or (b) *intended to take effect in possession or enjoyment after such death,* to any person or persons, * * *." (Emphasis and designating numerals and letters added for clarification of the ensuing discussion.)

From this it is seen that the antecedent of the words "which," wherever the same appear in the above quoted language of the statute, is "all property."

We have no difficulty in determining from this unmis-

takable language used in R.L.H. 1945, § 5552, as amended (now R.L.H. 1955, § 122-2), which is broad in its scope, that an inheritance tax is imposed: first, on successions from transfers by will or descent; and, secondly, on inter vivos successions from transfers (a) made in contemplation of death or (b) intended to take effect in possession or enjoyment after the death of the transferor. It is obvious from the contentions of the parties, as above set forth, that the submitted question in difference relates only to the latter type of transfer.

Applied to this situation the statute, as it relates to the type of transfer under question, then would naturally and literally read: "All property * * * which or any interest in or income from which, shall be transferred by deed, grant, sale or gift, * * * intended to take effect in possession or enjoyment after such death [of the grantor, vendor, or bargainor], to any person or persons, * * * in trust or otherwise, * * * shall be and is subject to a tax hereinafter provided for, * * *." This is the interpretation or construction advanced by the defendant in support of his contention.

The plaintiffs in passing allude to such an interpretation or construction of the statute "standing alone without qualification as to the residence of the donor or the situs of the property [as rendering the statute unconstitutional], as imposing an inheritance tax upon property owned by nonresidents not having a situs in the state." Nowhere does it appear that the plaintiffs, or any of the beneficiaries under the trust indenture of February 21, 1938, are or would be affected by the intimated unconstitutional application of the statute. Their plea falls on unresponsive ears. *Territory* v. *Sakanashi*, 36 Haw. 661; *Territory* v. *Reyes*, 33 Haw. 180. *Cf.*, *Wilson* v *Stainback*, 39 Haw. 67. It does not necessarily follow that such a construction would inevitably result in an unconstitutional application

of the tax. It is not enough for the plaintiffs to roil the waters, for theirs is the obligation in charting our course to steer us clear of the shoals of indetermination. *Cf.*, *Bishop* v. *Mahiko,* 35 Haw. 608; *In re Yerian,* 35 Haw. 855. In this they have failed and we do not regard the constitutionality of the statute as necessary to a decision in this case. *Territory* v. *Gaudia,* 41 Haw. 213; *Territory* v. *Reyes, supra,* 33 Haw. 180; *Andersen* v. *Arnold,* 30 Haw. 526.

In support of their contention, the plaintiffs would construe the language of the statute to impose "the requirement that the decedent retain a beneficial interest in the property at the time of his death" by relating the pronoun "which," preceding the provision in question to: "All property * * * from any person who may die seized or possessed of the same while a resident of the Territory, or which, being within the Territory, shall pass * * * from any person who may so die while not a resident of the Territory * * *" and connecting it with the pertinent language: "* * * which or any interest in or income from which, shall be transferred by deed, grant, sale or gift, * * * intended to take effect in possession or enjoyment after such death, * * *."

Both parties rely on the *Brown* case, *supra,* 20 Haw. 41, to support their respective interpretations or constructions of the statute. To counter the statement made therein by this court that the act does not "require that only such property be taxed as passes by will or descent or by transfer from one dying seized or possessed of it" (20 Haw. 44), the plaintiffs point to the following language of the opinion:

"* * * The transfer made by the owner in this case, *which secured to him the enjoyment of the property until his death,* is strictly within the plain meaning of the act. It cannot be said that one who has the income

of property does not enjoy it, although in order to dispose of it he would have to revoke its transfer and repossess himself of the muniments of title, as the stock certificates may be termed.

\* \* \* \* \* \* \* \*

"The act treats transfers of property, when so made that the beneficial rights to be derived from it remain with the transferrer during his lifetime, and that the transferree or others for whom he holds the property do not have the use or disposal of it until after the death of the tranferrer, as the same in legal effect as they are identical in substance with testamentary acts. If the devolution of property by will is taxable when made directly and expressed in the usual terminology of last wills and testaments the same is true of dispositions of property which are made for the purpose of accomplishing the same object, namely, for testamentary purposes.

\* \* \* \* \* \* \* \*

"If one wishes to retain the benefit or use of his property while placing its custody with another under directions for its disposition upon his death, reserving the right to change the disposition so that if none is made the settlement takes the place of a will, the tax follows precisely as in case of a will." (Emphasis added by plaintiffs, 20 Haw. 44-47.)

In that case, the settlor had transferred shares of stock to a trustee with directions to pay the income to the settlor during his lifetime, and upon his death to pay the income to his children in equal shares, and upon their death to deliver their proportionate shares to the heirs of each of them. In the event of the death of any child during the settlor's lifetime without leaving issue, the shares of stock allotted to that child were to revert to the settlor. The settlor reserved the right to vote the stock

and the right to revoke the trust. This court held the transfer to be subject to the inheritance tax in question.

It is interesting to note that the taxpayer there made the same contention now advanced "* * * that the gift was made inter vivos and took effect as such at the date of the assignment and therefore was not a transfer within the purview of the statute which, although it includes gifts which do not take effect in enjoyment or possession until after the death of the donor, nevertheless, as the plaintiff claims, is *confined to property of which the decedent died seized and possessed,* whether it passes by will or under the law of descents and distribution of property of persons dying intestate or by deed, grant, sale or gift. In this view the statute provides, as the plaintiff claims, that 'all property which shall pass from *any person who may die seized or possessed of the same* or which shall be transferred by deed or gift made by *one so seized or possessed* in contemplation of the death of the grantor or intended to take effect in possession or enjoyment after death, shall be subject to a tax,' etc. * * *." (Emphasis added, 20 Haw. 43, 44.)

This contention was disposed of by this court in a single short paragraph, portions of which are herein relied on, as seen, by both parties, as follows:

"The act is not open to construction and does not by any way of looking at it, without ignoring its clearly expressed provisions, require that only such property be taxed as passes by will or descent or by transfer from one dying seized or possessed of it. The transfer made by the owner in this case, which secured to him the enjoyment of the property until his death, is strictly within the plain meaning of the act. It cannot be said that one who has the income of property does not enjoy it, although in order to dispose of it he would have to revoke its transfer and repossess him-

self of the muniments of title, as the stock certificates may be termed." (20 Haw. 44.)

The remaining language of the opinion, set forth above, was utilized by this court in disposing of the further contention of the taxpayer therein advanced that the portion of the act in question was unconstitutional if construed so as not to require the settlor to have died "possessed of this property in order to subject its transfer to a tax" in that it would be "unequal and unjust in its operation" and "constitutes double taxation." The reason for the court's use of language, in terms of testamentary disposition, in describing the transfer there under consideration thus becomes readily apparent.

The language used by this court in disposing of the contention of the inapplicability of the act to the transfer there under consideration was utilized merely to describe how the transfer was "strictly within the plain meaning of the act" and does not, in our opinion, limit the application of the tax only to situations where the settlor reserves to himself some interest in, or control over, the transferred property.

The transfer described by this court in the *Brown* case covers a situation which has been universally considered as taxable. We do not understand the plaintiffs to dispute this. This was the most common type of transfer, made in avoidance of an inheritance tax, to come before the courts for consideration. It is noteworthy that other courts, having passed on such transfers and, in applying the tax, employed language similar to that found in the *Brown* case, have had no difficulty in addressing themselves to the application of the tax to transfers where no beneficial interest in or control over the transferred property was retained. *Bryant* v. *Hackett*, 118 Conn. 233, 171 Atl. 664. 668; *Chase* v. *Commissioner of Taxation*. 226 Minn. 521, 33 N.W.2d 706. in view of *In re Estate of*

*Rising,* 186 Minn. 56, 242 N.W. 459. It was only natural for this court in *Brown* to have used the language it did to the effect that a transfer of property in which the transferor retains the benefits of property during his life is in effect and substance the same as a testamentary disposition for such language was apt in view of the particular circumstances under consideration in that case.

In the *Brown* case, this court held in its answer to the taxpayer's contention therein precisely framing that issue that the statute did not require that a transferor die "seized or possessed" of transferred property in order to render taxable the passing of possession and enjoyment at his death. This recognizes the purpose of the legislature in enacting the statutory provision imposing a tax on inter vivos transfers intended to take effect in possession and enjoyment at or after the death of the transferor, which is to prevent the avoidance of the inheritance tax by reaching transfers analogous or akin to testamentary dispositions. *Hartford* v. *Martin,* 122 N.J.L. 283, 4 A.2d 31; *Bryant* v. *Hackett, supra,* 118 Conn. 233, 171 Atl. 664; *Hackett* v. *Bankers Trust Co.,* 122 Conn. 107, 187 Atl. 653. A contrary construction of the statute requiring that the transferred property have reference to property owned by a transferor at the time of his death would defeat the fundamental intent of the legislature to also tax transfers where ownership had passed from him during his life but which were to become effective at or after his death.

Plaintiffs, however, argue that such holding is not literally so, but that "the statement by the court [in *Brown*] that the act does not 'require that only such property be taxed as passes by will or descent or by transfer from one dying seized or possessed of it' * * * construed in context" compels the conclusion "that the court merely wished to make it clear that the words 'seized or pos-

sessed' should be broadly construed to include a transfer whereby the donor retained all of the income of the property during his lifetime, even though in form the reservation of such an interest in the property might not be understood as 'seisin' or 'possession' under the technical refinements of property law." Accordingly, plaintiffs' conclusion is that in the *Brown* case "the court held that the reservation of a beneficial interest in the property by the transferor was an essential ingredient of the tax."

It now becomes apparent that, under the construction of the statute advocated by the plaintiffs, not only is the language relating to seisin or possession present in the portion of the act dealing with transfers by will or descent to be transferred to that portion of the act dealing with inter vivos transfers, contrary to the usual rules of grammar, but also, this technical language is there to be given a different meaning than it logically possesses where physically found in the act. By way of understatement, this would indeed result in a strained construction of the statute.

It is apparent to us that the *Brown* case does not close the door on the imposition of the tax provided in R.L.H. 1945, § 5552, as amended (now R.L.H. 1955, § 122-2) on a transfer of property in trust in which the actual possession and enjoyment of the beneficiary takes place at or after and is made dependent on the death of the transferor, despite the lack of retention of any beneficial interest in the transferred property by the transferor. Since we are not persuaded that the strained construction of the statute demanded by the plaintiffs is compelled by the holding and language of this court in the *Brown* case, it behooves us to look to the cases, decided in other jurisdictions, cited by the plaintiffs in support of such construction.

Recognizing that the purpose of the possession and

enjoyment provision of the statute is to reach transfers testamentary in substance and in effect, we must also bear in mind, in our consideration of these cases, that R.L.H. 1945, § 5552, as amended (now R.L.H. 1955, § 122-2), being an inheritance tax, imposes the tax on the right or privilege of a beneficiary of receiving or succeeding to property upon the death of the prior owner rather than on the transmission of the benefits of property as in the case of an estate tax. "The thing burdened is the right to receive." *Leach* v. *Nichols,* 285 U.S. 165, 169. See also, *Buffinton* v. *Mason,* 327 Mass. 195, 97 N.E.2d 538, 541; *In re Rath's Estate,* 10 Cal. 2d 399, 75 P.2d 509, 512. Accordingly, the possession and enjoyment provision in an inheritance tax statute taxes the succession to, and not the transmission of, the benefits of property. *Saltonstall* v. *Saltonstall,* 276 U.S. 260, *affirming Saltonstall* v. *Treasurer & Receiver General,* 256 Mass. 519, 153 N.E. 4.

The nature of the tax and the purpose of the possession and enjoyment provision in an inheritance tax statute were thoroughly treated in the much cited opinion by Chief Justice Rugg of the Supreme Judicial Court of Massachusetts in *Coolidge* v. *Commissioner of Corp'ns & Tax'n,* 268 Mass. 443, 167 N.E. 757[9]:

"* * * The present excise under the statute was levied on the succession, not on the transmission, of the trust fund. As already pointed out succession is a quite different thing from transmission. It is manifest from the terms of the declaration of trust that the death of the survivor of the settlors was expressly fixed as the effective date of succession by the final beneficiaries to the enjoyment of the principal and

---

[9] Although the case was reversed on appeal to the United States Supreme Court (*Coolidge* v. *Long,* 282 U.S. 582), the reversal was grounded on the retroactive application of the statute being in contravention of the contract and due process clauses of the Federal Constitution.

income of the trust estate. The excise statute here controlling and already quoted is designed to include within its sweep all methods of succession to property to take effect in possession or enjoyment after the death of the grantor or donor other than those made inter vivos for a bona fide consideration. By express words it embraces succession created by deed. Whenever property is conveyed upon such limitation that it will vest in interest, possession or enjoyment by reason of the death of the grantor or donor, such succession falls within the descriptive words of the statute. The succession to any of these attributes of property occurring as the result of the death of the grantor or donor constitutes the taxable commodity. Magee v. Commissioner of Corporations and Taxation, 256 Mass. 512, 515, 153 N.E. 1." (167 N.E. 759, 760.)

Since it is the succession that is taxable it was deemed to be unnecessary that the property interests pass directly from the donor at the time of his death:

"* * * If the beneficiary under the instrument of gift succeeds to an interest in the property not previously enjoyed, which bears a distinct and necessary relation to the death of the grantor or settlor, that is a succession subjected to the excise by the terms of the statute." (167 N.E. 760.)

To the same effect is *Saltonstall* v. *Treasurer & Receiver General, supra,* 256 Mass. 519, 153 N.E. 4, *aff'd, Saltonstall* v. *Saltonstall, supra,* 276 U.S. 260. See also, *Hartford* v. *Martin, supra,* 122 N.J.L. 283, 4 A.2d 31.

This basic difference in the nature of an inheritance tax as contrasted with that of an estate tax is the principal distinguishing feature of most of the cases relied on by the plaintiffs and rendering them inapplicable to our problem. Of course there are other differences in some of these cases which will be indicated as they are considered.

*Reinecke* v. *Trust Co.,* 278 U.S. 339[10] was properly concerned, in construing the Federal Estate Tax Law, with the effect of the transfer on decedent's estate, namely, what the donor had retained up to the time of his death, and so affords no criterion for our guidance. As stated in *Y. M. C. A.* v. *Davis,* 264 U.S. 47, 50: "* * * What this law [Federal Estate Tax] taxes is not the interest to which the legatees and devises succeeded on death, but the interest which ceased by reason of the death." If a decedent during his lifetime conveyed away all interest in his property, it cannot be said that there remains in his estate at his death any of the rights to property and the Federal Estate Tax does not apply. This was the basis of the *Reinecke* case and has no application to the Hawaii inheritance tax.

The plaintiffs' remaining cases fall into three categories: *First,* those where "possession or enjoyment" had no direct relationship to the death of the donor. *Downes* v. *Safe Deposit & Trust Co.,* 163 Md. 30, 161 Atl. 400; *In re Glosser's Estate,* 355 Pa. 210, 49 A.2d 401; *In re Dolan's Estate,* 279 Pa. 582, 124 Atl. 176; *In re Taxation of Masury's Estate,* 28 App. Div. 580, 51 N.Y.S. 331, *aff'd without opinion* in 159 N.Y. 532, 53 N.E. 1127[11]; *In re*

---

[10] Subsequent decisions of the United States Supreme Court have impaired, if not almost nullified, the authority of the *Reinecke* case. See *Helvering* v. *Hallock,* 309 U.S. 106; *Fidelity Co.* v. *Rothensies,* 324 U.S. 108; *Commissioner* v. *Estate of Field,* 324 U.S. 113; *Commissioner* v. *Estate of Church,* 335 U.S. 632, and *Estate of Spiegel* v. *Commissioner,* 335 U.S. 701.

[11] The surrogate in the case of *In re Patterson's Estate,* 127 N.Y.S. 284, 286, recognized that the language in the *Masury* case, now relied on by the plaintiffs, was dictum "* * * superfluous to the decision of the point at issue in that case, and does not seem to be followed by later authority." See discussion *infra.* Factually, in *Masury,* there was no succession of economic benefit at the donor's death, only a change of the person of the guardian. As the court there pointed out: "* * * If they [the beneficiaries] were in the enjoyment of the property, or the income from the property, prior to the death of the grantor, and if their relations to the property were not changed by the fact of such death," then the transfer was not taxable. *In re Taxation of Masury's Estate, supra,* 28 App. Div. 580, 51 N.Y.S. 331, 333.

*Carnegie's Estate,* 203 App. Div. 91, 196 N.Y.S. 502, *aff'd,* 236 N.Y. 517, 142 N.E. 266; *People* v. *Armiger,* 372 Ill. 415, 24 N.E.2d 355; *Department of Revenue* v. *Kentucky Trust Co.* (Ky. 1958), 313 S.W.2d 401. *Cf., People* v. *Northern Trust Co.,* 330 Ill. 238, 161 N.E. 525, 529, where the court observed that "the provisions as to the grantor's death only served as an alternative limitation of the time of the accumulation [of income], the other alternative being the end of 21 years." Consequently, the language of these cases relied upon by the plaintiffs in support of their contention has only the persuasive force of dicta. In the majority of these cases, the sole question was whether a reserved power of revocation, or similar power, in itself rendered taxable a transfer which otherwise had no reference to the donor's death as the condition of possession or enjoyment. While we might disagree with those courts on the effect of a reserved power of revocation on taxability, in view of *Thomson* v. *McGonagle,* 33 Haw. 594, still none directly focuses its attention on the point at issue here, namely, on gifts "intended to take effect in possession or enjoyment" *after the death of the donor.*

*Second,* those where the question of statutory construction is obviated, as the statutory language therein involved clearly and expressly includes the words "dying seized or possessed," or words of like import, in the "possession or enjoyment" provision of the statute. *Downes* v. *Safe Deposit & Trust Co., supra,* 163 Md. 30, 161 Atl. 400; *Highfield* v. *Equitable Trust Co.,* 34 Del. 509, 155 Atl. 724. As stated by the Delaware court in *Highfield:* "A crucial word of the statute is the word 'belonging.'" (155 Atl. 726.) These cases scarcely compel the transposition of the words "dying seized or possessed" into the pertinent portion of our statute by way of construction.

*Third,* those which factually support the contention of the plaintiffs on the issue before us. These are the remain-

ing five cases, representing the three jurisdictions of Ohio, Illinois and Michigan. *In re Heine's Estate* (P.Ct. Ohio 1950), 100 N.E.2d 545; *State* v. *Welch's Estate,* 235 Mich. 555, 209 N.W. 930; *In re Rackham's Estate,* 329 Mich. 493, 45 N.W.2d 273; *People* v. *Moses,* 363 Ill. 423, 2 N.E.2d 724; *People* v. *Northern Trust Co., supra,* 330 Ill. 238, 161 N.E. 525[12]. These cases seem concerned with the fine distinctions of the law of future interests and place determinative emphasis on the vesting of the legal title and right to possession and enjoyment. Such a view does not move us, as it ignores the real purpose of the possession and enjoyment provision to tax a succession completed after the death of the transferor. Formal distinctions pertaining to the law of real property, as well as the niceties of the art of conveyancing or of the law of contingent and vested remainders are "irrelevant criteria in this field of taxation." *Helvering* v. *Hallock; supra,* 309 U.S. 106, 111. See also, *Commissioner* v. *Estate of Church, supra,* 335 U.S. 632, 643. It is interesting to note that such technical basis for nontaxibility becomes incongruous in the face of the usual and general holding that the transfer of the vested and nondivestible remainder interest in a trust in which a life estate was reserved by the transferor is taxable.

A study of the language utilized in the foregoing cases, and upon which the plaintiffs rely, discloses a subtle, if sometimes unconscious, concern of the courts over what remains after the transfer in the hands of the donor until his death. Despite the assigned reasons for nontaxability and while these courts have given recognition, and even emphasis, to the purpose of the possession and enjoyment provision of the tax to reach transfers testamentary in

---

[12] As seen above, the alternative period of 21 years in lieu of the donor's death, if it occurred sooner, for effective possession or enjoyment, makes it arguable that the donor did not intend the gift to take effect in "possession and enjoyment" after his death.

substance, yet the nature of an inheritance tax to burden the recipient has been ignored, or at least overlooked. In the light of this, the true legislative intent has become clouded through the confusion resulting from the application of estate tax principles to situations involving an inheritance tax.

In view of the lack of persuasive support to be found in the above reviewed cases for the strained construction of R.L.H. 1945, § 5552, as amended (now R.L.H. 1955, § 122-2), pressed by the plaintiffs, this construction takes on even more of an air of unwarranted distortion, rendering it too improbable for acceptance. The concept "seized or possessed" is consistent with, and logically applicable to, testate and intestate successions while inconsistent with, and logically inapplicable to, inter vivos successions.

On the other hand, when recognition is given by the courts not only to the purpose of the possession and enjoyment provision of statutes similar to that of Hawaii[13] but also to the nature of an inheritance tax, no difficulty is experienced in applying such statutes, as read and interpreted normally, employing only the rules of grammar and punctuation while adhering to the commonly accepted meaning of the language. Accepting such statutes at their face value, succession being the taxable incident, the tax has been applied whenever actual succession, possession and enjoyment takes place at, is dependent upon and is brought about by, or is withheld until, the death of the

[13] The language relating to the type of transfer here in issue and found in the statutes considered by the courts in these cases is essentially the same as that employed in R.L.H. 1945, § 5552, as amended (now R.L.H. 1955, § 122-2). All impose a tax on transfers "intended to take effect in possession or enjoyment [at or] after" the death of the transferor. Texas, Massachusetts, Connecticut, New Jersey, New York, California and Minnesota. However, unlike the Hawaii statute all of these statutes qualify the subject matter of the transfer as to the residence of the donor or the situs of the property. Most of them have clarifying language in the designation of the various categories and types of transfer by appropriate numerals and letters. New Jersey, New York, California and Minnesota.

transferor. *Bethea* v. *Sheppard* (Tex.Civ.App. 1940), 143 S.W.2d 997; *Gregg* v. *Commissioner of Corp'ns & Tax'n,* 315 Mass. 704, 54 N.E.2d 169; *Hackett* v. *Bankers Trust Co.,* 122 Conn. 107, 187 Atl. 653; *Schroeder* v. *Zink,* 4 N.J. 1, 71 A.2d 321; *Koch* v. *McCutcheon,* 111 N.J.L. 154, 167 Atl. 752; *In re Hollander's Estate,* 123 N.J.Eq. 52, 195 Atl. 805; *In re Green's Estate,* 153 N.Y. 223, 47 N.E. 292; *In re Cruger,* 54 App.Div. 405, 66 N.Y.S. 636, *aff'd,* 166 N.Y. 602, 59 N.E. 1121; *In re Patterson's Estate,* 127 N.Y.S. 284, *aff'd,* 146 App.Div. 286, 130 N.Y.S. 970[14], *aff'd without opinion,* 204 N.Y. 677, 98 N.E. 1109; *In re Madison's Estate,* 26 Cal. 2d 453, 159 P.2d 630; *Chase* v. *Commissioner of Taxation, supra,* 226 Minn. 521, 33 N.W.2d 706. As the New Jersey court succinctly stated in *Koch* v. *McCutcheon, supra,* the test of taxability is whether "there is an estate passing at the death of the donor" (167 Atl. 753). Or as observed by the Minnesota court in *Chase* v. *Commissioner of Taxation, supra,* reliance is placed "upon the statutory expression 'intended to take effect in possession or enjoyment' as having reference to the donee's acquisition of final and complete title, rather than to the action of the donor in divesting himself of power and control at the time the transfer is made." (33 N.W.2d 710.)

In *Hackett* v. *Bankers Trust Co., supra,* the Connecticut court pointed out that the retention by a donor of the enjoyment of or dominion over property until his death

---

[14] The opinion of the appellate division, 130 N.Y.S. 970, emphasizes the fact that although one of the remaindermen had a vested interest he could not take possession and enjoyment unless he survived the donor. This fact is also present in the case at bar. The possession and enjoyment of the secondary income beneficiaries (Miss Wilcox's seven named nephews and nieces or their issue) would depend upon their surviving the donor, and the possession and enjoyment of the corpus by the issue of the nephews and nieces could take effect only if they were alive 20 years after the death of the last survivor of the nephews and nieces. In other words, their possession and enjoyment was contingent on survivorship and became effective at a time after Miss Wilcox's death. This additional ground is not relied on inasmuch as the other grounds considered in the opinion are decisive of the issue.

does not have the same significance in an inheritance tax which is levied upon the beneficiary for the privilege or right of succession to property as it does in the case of the Federal Estate Tax which is on the transfer, at death, of property from the decedent; for in the case of the inheritance tax the important consideration is whether there is a shifting of the benefits of property occasioned by and occurring at or after the death of the "former owner" thereof. See also, *Bridgeport-City Trust Co.* v. *McLaughlin,* 2 P-H, Inh. & Trans. Tax Serv. (Conn. 1941), § 1010, p. 1025.

The controlling factor is not whether the right to future possession and enjoyment is vested in the donee at the time of the making and delivery of the instrument of gift but whether the fruition of that right is necessarily postponed during the life of the donor and his death is the requisite to the termination of the postponement. *Hartford* v. *Martin,* 122 N.J.L. 283, 4 A.2d 31, *affirming* 120 N.J.L. 564, 1 A.2d 13, which *aff'd* 122 N.J.Eq. 489, 194 Atl. 800; *In re Cruger, supra; In re Green's Estate, supra.* As pointed out by the New Jersey court in *Hartford* v. *Martin, supra,* "* * * the dispositive question is whether the shifting of the possession and enjoyment of the subject matter of the succession is dependent upon the settlor's death." (4 A.2d 33.)

The test of taxability is not whether there is a complete divesting of the transferor's interest or ownership at the time of execution and delivery of the instrument of transfer or whether he reserved some interest or power until his death but rather whether complete succession takes place at or after his death. *State Street Trust Co.* v. *Treasurer & Receiver General,* 209 Mass. 373, 95 N.E. 851; *In re Hollander's Estate, supra,* 123 N.J.Eq. 52, 195 Atl. 805; *Bryant* v. *Hackett, supra,* 118 Conn. 233, 171 Atl. 664; *Hartford* v. *Martin, supra,* 122 N.J.L. 283, 4 A.2d 31,

*affirming* 120 N.J.L. 564, 1 A.2d 13, which *aff'd* 122 N.J.Eq. 489, 194 Atl. 800; *In re Madison's Estate, supra,* 26 Cal. 2d 453, 159 P.2d 630; *Chase* v. *Commissioner of Taxation, supra,* 226 Minn. 521, 33 N.W.2d 706. The Massachusetts court in *State Street Trust Co.* v. *Treasurer & Receiver General, supra,* thus posed the question: "* * * The test [of nontaxability depends] * * * upon the passing of the property with all the attributes of ownership independently of the death of the transferror. * * *." (95 N.E. 852.) The California court in the case of *In re Madison's Estate, supra,* stated that "the issue is not whether the donor retained some power or interest until his death, but rather whether he tied up the property with so many strings, which could not be loosened until his death, that the transfer may be regarded as having been intended to take effect in possession or enjoyment at his death within the meaning of the statute." (159 P.2d 633.) The New Jersey court puts it another way in the case of *In re Hollander's Estate, supra,* by concluding: "* * * Where there is a transfer of a specific interest in property and the succession of the transferee does not become, and under the terms of the transfer is not to become, complete until a time at or after the death of the transferor, that transfer is taxable. * * *." (195 Atl. 808.)

A gift inter vivos is complete and not taxable under an inheritance tax if it has no reference to the death of the donor as the condition of possession and enjoyment by the donee. *In re Estate of Rising, supra,* 186 Minn. 56, 242 N.W. 459. So tested the transfers in the present case were not completed and nontaxable inter vivos gifts. The Minnesota court went on to point out that if in a gift the donor makes his death both the condition on and the occasion for his donee's coming into actual possession and enjoyment, for all practical purposes death plays the same part as it does in the case of intestacy. Analogizing the

gift of the remainder there involved with gifts causa mortis, and those made by will, the court noted that the remainderman had no more right to succeed to the possession of the property than legatees of devisees under a will.

It is this recognition of both the nature of the tax imposed by the possession and enjoyment—a tax on succession—and of its purpose—to prevent the avoidance of the inheritance tax by reaching transfers analogous or akin to testamentary dispositions—that have resulted in the decisions that a gift of property in trust is taxable if the donee's possession and enjoyment has been withheld from him until the death of the donor. In principle there is no difference between property passing by an instrument intended to take effect in possession or enjoyment after the death of the donor and the same property passing by will. *Crocker* v. *Shaw*, 174 Mass. 266, 54 N.E. 549. As far as succession by the donee is concerned, whether the donor has reserved a life use for himself or has withheld a use measured by his life for the benefit of another, it takes place only at or after the death of the donor. *Bryant* v. *Hackett, supra*, 118 Conn. 233, 171 Atl. 664. A transfer involving the latter type of withholding from the donee is no less testamentary in character than the former which, admittedly, is taxable. *Hackett* v. *Bankers Trust Co., supra*, 122 Conn. 107, 187 Atl. 653. Furthermore, there is also in principle and in effect no less a succession by the donee in both types of transfers than the succession by a beneficiary under a will.

And here the succession by Miss Wilcox's nephews and nieces and their issue taking place from and after her death is none the less so by her having made the income from the entrusted property payable to the "Elsie H. Wilcox Foundation" than had she provided for the payment of the same income to herself.

The opinion in *Bryant* v. *Hackett, supra*, makes clear that:

"* * * This purpose and policy might be as completely defeated by a transfer of property in such a way that the owner has parted with all control and dominion over it as by one where he reserves such control. Such a reservation might perhaps make taxable a transfer which otherwise would not be, but the lack of it does not prevent the taxation of transfers falling within the terms of the statute. Nor can any valid distinction be made between cases where, as in those before us in the Guaranty Trust Co. Case, the transferor, by an irrevocable grant, transferred property with a reservation of a life use to himself and those where, by a like grant, he gives the life use to another with remainder over." (171 Atl. 668.)

Having completed the cycle, we return to our starting point that the statute is clear and perfectly understandable when read in the light of the ordinary rules of grammar. *Brown v. Treasurer, supra.* There is no necessity to transpose any portion of the statute or to give like phrases double meanings to glean the intent of the legislature, otherwise clearly expressed. It is fundamental that in construing or interpreting a statute, in order to ascertain the intent of the legislature, the language used therein is to be taken in the generally accepted and usual sense. Courts will presume that the words in a statute were used to express their meaning in common usage. *In re Taxes, Haw'n Pineapple Co.,* 45 Haw. 167, 177, 363 P.2d 990. This principle is equally applicable to a tax statute. *Crane v. Commissioner,* 331 U.S. 1, 6; *In re Taxes, Haw'n Pineapple Co., supra; In re Taxes, Johnson,* 44 Haw. 519, 530, 356 P.2d 1028. The rule of strict construction advocated by the plaintiffs is only to be resorted to as an aid to construction when an ambiguity or doubt is apparent on the face of the statute, and then only after other possible extrinsic aids of construction available to resolve the am-

400

biguity have been exhausted. *In re Taxes, Haw'n Pineapple Co., supra.* R.L.H. 1945, § 5552, as amended (now R.L.H. 1955, § 122-2), is clear and certain in its terms. "Where the language of the statute is plain and unambiguous there is no occasion for construction and the statute must be given effect according to its plain and obvious meaning." *Kauai* v. *McGonagle,* 33 Haw. 915, 920.

The plaintiffs have called our attention to a scholarly and comprehensive law review article dealing with *Taxation of Transfers Taking Effect in Possession at Grantor's Death,* written in 1941 by Henry Rottschaefer, Professor of Law, University of Minnesota Law School, appearing in 26 Iowa L.Rev. 514. Quotations therefrom favorable to the plaintiffs' position were referred to in their briefs and are included in the fuller excerpts set out below. The Professor commences his discussion thusly:

"The inheritance tax was never intended to be a gift tax. Its aim was the more limited one of taxing successions occurring as a result of the death of the owner of the transferred property in situations in which such owner had enjoyed the economic benefits of the property until the moment of his death. The complete realization of that objective demanded that something more be taxed than transfers by will or under the laws of intestate succession. * * * The provision of existing state inheritance tax statutes which includes among the taxable transfers those intended to take effect in possession or enjoyment at or after the death of the transferor was one of the earliest employed to prevent tax avoidance. It has given rise to a veritable flood of litigation. * * * ."

In discussing transfers similar to the one here under consideration he continues:

"The decisions in which particular transfers have been held not includable among those intended, etc.,

[to take effect in possession or enjoyment at or after the death of the transferor] have frequently stressed the factor that the grantor has, by the transfer in question, completely divested himself of his entire interest in the transferred property. The question arises whether this alone suffices to make the transfer nontaxable. *The language of the statute suggests that it does not,* since some of the interests created may be limited to take effect in possession or enjoyment at or after the grantor's death *within a not unreasonable interpretation of that expression.* * * * Whether the taxation of an interest, created by a deed by which the grantor completely disposes of his entire interest in the property, merely because that interest is limited to take effect in possession or enjoyment at or after the grantor's death accords with the real purposes underlying the taxation of transfers intended, etc., [to take effect in possession or enjoyment at or after the death of the transferor] may well be doubted. It amounts to the taxation of completed gifts not made in contemplation of death. *It is however, within the strict letter of the statutory provision.* * * *." (Emphasis added, 26 Iowa L.Rev. 536, 537.)

And again, he observes:

"* * * While a transfer by which a grantor divests himself of his entire interest in the property should be tax-free as a matter of principle, the succession to interests created thereby is *frequently held taxable* if they are limited to commence in possession or enjoyment at or after the grantor's death. * * *." (Emphasis added, 26 Iowa L.Rev. 539.)

In his conclusion, he states:

"* * * The cases reviewed have covered a long period during which the reasoning employed has undergone important changes. The courts in the *earlier cases*

sought solutions of the problems involved by what may be described as rather *technical lines of reasoning*. It is impossible to wholly avoid this, but the more *recent decisions* have shifted the emphasis from them to the theory that *the really important factor is the shifting of the real economic benefits effected* by a transfer. If that is in any manner dependent upon the grantor's death, taxability is affirmed. * * *." (Emphasis added, 26 Iowa L.Rev. 547.)

It is seen that Professor Rottschaefer has accepted, as has this court, the realities of life and that principles in taxation are resolved by legislative fiat, albeit contrary to personal feelings in the matter. The imposition of a tax is a legislative function and in its application the courts have no choice but to follow the intent of the legislature. Here that intent is clearly and plainly expressed so as to apply to the transfer under consideration. Any feelings of apparent inequity dissolve if we bear in mind that "the thing burdened is the right to receive." *Leach* v. *Nichols, supra,* 285 U.S. 165, 169.

Accordingly, the question in difference under the submission is answered in the affirmative that "the property entrusted under the terms and conditions of the aforementioned trust indenture of February 21, 1938, is subject to inheritance taxes imposed by Section 5552, Revised Laws of Hawaii 1945, as amended (now Section 122-2, Revised Laws of Hawaii 1955). Judgment will be entered for the defendant affirming the assessment and requiring the defendant, or his successor in office, to pay the said sum of $14,606.37 held in escrow over to the Director of the Department of Taxation.

*Harold S. Wright* and *J. Russell Cades* (*Smith, Wild, Beebe & Cades* on the briefs) for Plaintiffs-Appellants.

*Nobuki Kamida,* Deputy Attorney General (*Shiro Kashiwa,* Attorney General, with him on the brief) for Defendant-Appellee.

IN RE TAXES, AIEA DAIRY, LTD.

No. 4098.

MARCH 27, 1963.

TSUKIYAMA, C.J., CASSIDY, WIRTZ, JJ., CIRCUIT JUDGE
TASHIRO, IN PLACE OF LEWIS, J., DISQUALIFIED,
AND CIRCUIT JUDGE KITAOKA, IN PLACE OF
MIZUHA, J., DISQUALIFIED.

*Per Curiam.* Since everything presented under the petition for rehearing, filed herein, was heretofore considered by the court in reaching its decision of February 25, 1963, and nothing new is before the court, the petition is denied without argument.

*Bert T. Kobayashi,* Attorney General, and *Carlos Ramelb,* Deputy Attorney General, for the petition.

IN THE MATTER OF ARTHUR K. TRASK,
ATTORNEY AT LAW.

No. 4104.

MARCH 29, 1963.

TSUKIYAMA, C. J., CASSIDY, WIRTZ, JJ., CIRCUIT JUDGE
JAMIESON IN PLACE OF LEWIS, J., DISQUALIFIED,
AND CIRCUIT JUDGE HEWITT IN PLACE OF
MIZUHA, J., DISQUALIFIED.

*Per Curiam.* This matter is before us on exceptions taken by Arthur K. Trask, respondent attorney, to the report submitted to the court on November 6, 1958, by the commissioners on improper or unprofessional conduct (commonly designated the legal ethics committee) appointed and acting under rule 16 of this court. It was the unanimous finding of the three commissioners submitting the report that the respondent was guilty of unethical conduct and it was their recommendation that he be censured and that his license to practice be revoked or suspended for such period as the court might deem appropriate. This court designated the attorney general to act as attorney in support of the recommendations of the commissioners.

The proceedings were initiated by the complaint of Elizabeth Cox Abrams set out in a letter addressed to this court under date of September 6, 1956. The clear import of the letter charged the respondent with repudiating an agreement he had made with the complainant on the amount of the fee he would charge in representing her in the action hereinafter referred to. The complaint was first referred by the commissioners to the committee on inquiry for the first circuit, which, after a preliminary investigation, recommended that the commissioners take cognizance of and act on the charge. Hearing before the com-

missioners commenced on May 27, 1957. The respondent appeared and personally conducted his defense before the commissioners.

The exceptions to the commissioners' report cover a wide range. The number of points raised and the technical nature of many of the contentions made by respondent tend to obscure the issue on the merits of the case. In order to bring these proceedings into proper focus at the outset, we will first turn to and consider that issue as it is presented by the respondent's exceptions 4 and 5, challenging the sufficiency of the charge and the evidence to sustain it.

Mrs. Abrams was injured in an automobile accident on August 5, 1953. On September 2, 1954, the respondent filed a suit in the Federal District Court of Hawaii for recovery of damages sustained by Mrs. Abrams and her husband as a result of the accident. He later filed a suit on behalf of complainant's children for damages alleged to have resulted to them for loss of nurture, comfort, solace, et cetera, as a result of the injuries she sustained. The suits were consolidated for trial. Attorney John Alexander was associated with respondent in the trial of the case, which commenced on November 7, 1955, and ended exactly a month later when the jury returned a verdict in favor of Mrs. Abrams in the amount of $40,000.00, and in favor of her children in the amount of $10,000.00.[1]

It is definitely established and conceded that after respondent was retained and some time before commencement of the trial he advised Mrs. Abrams and orally agreed he would represent her on a contingency arrangement by which he would receive 25% of the amount of any recovery in any settlement made before trial, 30% of the

[1] The judgment entered on the verdict for the children was eventually set aside and their action was ordered dismissed by the Ninth Circuit Court of Appeals. *Meredith* v. *Scruggs*, 9 Cir., 244 F.2d 604.

recovery upon trial, and 40% of the recovery if an appeal followed.

Respondent received a check in the amount of $40,148.66 in satisfaction of the judgment and accrued interest. It was made out jointly to respondent, Mr. Alexander and Mrs. Abrams. On February 3, 1956, respondent presented the check to Mrs. Abrams through his secretary for her endorsement. At the same time she was tendered respondent's personal check in the amount of $26,148.66 as the purported net amount due her after the deduction of his fee. In a covering letter, respondent stated: "The division: $14,000 (35% of $40,000) represents gross attorneys' fees."

Mrs. Abrams testified that when she saw respondent's check she immediately realized it was made out for less than the amount she knew she was entitled to receive, and, the secretary being unable to give her an explanation for the discrepancy, she telephoned the respondent and protested that, under the agreed 25%–30%–40% fee arrangement, his check to her was $2,000.00 short. She said the respondent told her she was in error on the percentages and that he insisted their agreement for his fee was on a 25%, 35%, and 39% basis. She said that she reminded him she needed the money to pay her debts but that he told her, "Well, unless you sign I can't give you the money, and that's it." The complainant testified she insisted in her protest that she was entitled to $2,000.00 more but as her efforts to convince respondent were ineffectual, she acquiesced, endorsed the check for the judgment and accepted the check tendered by respondent because of her necessitous circumstances.

The respondent's version of the conversation over the telephone was that Mrs. Abrams told him that the agreement called for 30%, that he said it was 35%, that she then said she didn't remember, and that he thereupon told

her, "So you can do what you want to do but I feel that's it."

The chairman of the ethics committee asked the respondent if he told Mrs. Abrams "that if she signed the check she would be admitting that she owed you the 35[%] and that she couldn't make any claim for it?" Respondent's reply was that he did not, "because she was extremely —apparently capable of knowing what she was doing. She said it was 30 and I said it was 35. I didn't know whether or not she was going to sign it or not. That is my solemn remembrance."

In response to another commissioner's question as to whether he felt that by signing the check Mrs. Abrams was acquiescing in his contention that it was 35%, respondent replied: "I devotedly do and particularly with this: subsequent to that, I was rehired, she was calling me when she was in the hospital. Mr. Wrenn, I do."

Mr. Alexander entered the case a week or two before the trial started. There is conflict on whether the suggestion to obtain an associate counsel emanated from the respondent or Mrs. Abrams, but it is the respondent's position and testimony he telephoned Mrs. Abrams after he had engaged Mr. Alexander to help him and told her that by reason of the additional cost to him from Mr. Alexander's coming into the case the fee allowance for the trial would have to be changed to 35%, and that she said that was agreeable to her. Mrs. Abrams denied that such agreement or any other to modify the original schedule of fee allowance was ever proposed or made. This was and is the crucial issue in the case.

The commissioners resolved the issue against the respondent. We are convinced from an independent consideration of the testimony and the evidence in the record that the conclusion reached by the commissioners was the correct one.

In appraising the credibility of the two principal witnesses on the written record we are without the benefit the commissioners had of observing their respective manners and demeanors in testifying. However, on a comparison of their testimonies as transcribed we think the conclusion is inescapable that the testimony of Mrs. Abrams carries much greater conviction than that of the respondent.

The commissioners state in their report they were much impressed by the straightforwardness of Mrs. Abrams. The attorney general urges that the respondent was evasive and unresponsive in answering many pertinent questions put to him. The record compels us to agree with them. In addition, Mrs. Abrams' testimony is corroborated and supported by independent, credible testimony on many incidental factual issues that developed during the course of the hearing. One instance, by way of example, is the clash between her testimony that she requested respondent on many occasions to let her know what he was going to charge and to put it in writing, and the respondent's testimony that no such request was ever made. Her testimony is fully corroborated by the respondent's secretary who testified that even though he did not know what the respondent intended to charge, he had endeavored over a period of months, without success, to induce him to enter into a written fee agreement with his client. The testimony of this witness also tends to refute the respondent's testimony to the effect that Mrs. Abrams told him over the telephone on February 3, 1956, that she had forgotten the fee arrangement called for 35%, and to sustain her testimony that she insisted and maintained that she knew it was 30%. Finally, the clear-cut evidence respecting the shocking manner in which the respondent attempted to take advantage of and shortchange his associate counsel tends to indicate respondent's bent of mind

on February 3, 1956, and to strongly support the complainant's charge against him.

Mr. Alexander testified that when respondent engaged him as associate counsel the respondent agreed that he would "pay me 25% of his fee—whatever he earned on it." Respondent does not contend that any other agreement was made with Mr. Alexander. Respondent's testimony in that respect was: "I told him that for the peace of mind of the Abramses that it would be good perhaps that he entered the case, they would feel probably a little more comfortable about it, and if he would be free to do so and he said yes. So I told him that it will be one-fourth of the fee that I was getting." Mr. Alexander said he was not informed and did not ask what the fee arrangement between respondent and Mrs. Abrams was. The respondent testified to the same effect. However, some weeks after the trial but before the controversy arose between respondent and Mrs. Abrams, Mr. Alexander requested that information from Mrs. Abrams and was told that her agreement with the respondent was on a 25%–30%–40% basis. He testified that the reason he made this inquiry of Mrs. Abrams, rather than of the respondent, was that toward the very end of the trial the respondent "began behaving cooly to me."

On February 3, 1956, the same day that respondent tendered the payment to Mrs. Abrams, he sent Mr. Alexander a check in the amount of $2,000.00 in payment for services as associate counsel. Knowing from the information given him by Mrs. Abrams that he was entitled to $3,000.00 as his one-fourth share of the fee payable by her, Mr. Alexander rejected the tendered check and demanded proper payment. Within a matter of a few hours respondent sent him a check in the amount of $3,000.00. Respondent's explanation for sending the first check was that he was dissatisfied with his associate's work and that on his

evaluation of it Mr. Alexander was entitled to no more than $2,000.00. The excuse and respondent's unnecessary and, we think, unjustified abuse of his fellow lawyer before the commissioners to support it, merely aggravate the grievance.

Respondent testified that he normally fixed his rates when retained on a contingent basis considerably in excess of 25%–30% and 40%, and that he agreed to the lesser rates with Mrs. Abrams because of his close friendship since boyhood with her husband. The commission recognized that respondent rendered valuable service to his client. The record bears out that he did perform his task with commendable ability and effort in a difficult case and against a formidable opponent. There can be no question that in a comparable case a contingent trial fee of 35% would be entirely reasonable. It is not difficult therefore to see how respondent could have reached the conclusion in retrospect, that with the association of Mr. Alexander on the terms he had engaged him, he had made an improvident arrangement for his share of the fee. However, this obviously was no justification for any attempt on his part to unilaterally modify his agreement with either Mr. Alexander or Mrs. Abrams. *In re Burns,* 55 Idaho 190, 40 P.2d 105; *In re Choate,* 174 Okla. 446, 50 P.2d 706.

It has been held in this jurisdiction that in disciplinary proceedings the charge against an attorney accused of unprofessional conduct must be sustained by clear and convincing proof. *In re Davis,* 15 Haw. 220; *In re French,* 28 Haw. 47; *In re Bouslog-Sawyer,* 41 Haw. 403. These cases were decided when the rule governing disciplinary proceedings contained no provision respecting the quantum of proof. The rule (rule 16) governing this proceeding was adopted in 1955. Paragraph (c) (9) thereof provides that, in contested cases, "the charge must be established by a preponderance of the evidence." By paragraph

(c) (12) of the rule it is further provided that, "The court will adopt a finding of fact made by the commissioners unless upon a consideration of the entire record it is of the opinion that such finding is not supported by a preponderance of the evidence." The degree of proof required by the rule is consistent with the nature of disciplinary proceedings. *In re Mayberry,* 295 Mass. 155, 3 N.E.2d 248. Proof by a "fair" or a "clear" preponderance of the evidence is all that is required in many, if not in most, jurisdictions. See Annot. 105 A.L.R. 984 and note in 37 Notre Dame Lawyer 346.

We are convinced, after full and careful scrutiny of the entire record, that the charge against the respondent is clearly and satisfactorily supported by a preponderance of the evidence.

It is in effect contended on behalf of respondent, however, that even if Mrs. Abrams' charge and her testimony are accepted at face value, all that is proven is that a bona fide dispute existed between attorney and client over the amount of a fee calling only for civil redress and that, however viewed, no specific violation of the Canons of Professional Ethics has been shown.[2]

To hold an attorney answerable for unprofessional conduct, it is not necessary that his offense be specifically spelled out in some particular provision in the code of ethics. The canons of ethics were not intended to have that restrictive effect, as clearly appears from the preamble, reading: "No code or set of rules can be framed, which will particularize all the duties of the lawyer in the varying phases of litigation or in all the relations of professional life. The following canons of ethics are adopted by the American Bar Association as a general guide, yet the

---

[2] Rule 16(a) of this court provides: "*Canons.* The Canons of Professional Ethics and the Canons of Judicial Ethics, adopted by the American Bar Association, shall govern the conduct of the judges and the members of the Bar of the Territory of Hawaii."

enumeration of particular duties should not be construed as a denial of the existence of others equally imperative, though not specifically mentioned."

Canon 11 of the Canons of Professional Ethics, in part, provides: "The lawyer should refrain from any action whereby for his personal benefit or gain he abuses or takes advantage of the confidence reposed in him by his client." This canon expressly reflects the generally accepted and universally recognized tenet that the special relationship existing between attorney and client requires the utmost honesty, good faith and fairness on the part of the attorney in all of his dealings with his client. As stated in 7 C.J.S., *Attorney and Client*, § 125, p. 957: "Not only must an attorney exercise reasonable care and diligence and possess the legal skill and knowledge ordinarily possessed by members of the profession, but he is bound to conduct himself as a fiduciary occupying a position of the highest trust and confidence, so that, in all his relations and dealings with his client, it is his duty to exercise the utmost honesty, good faith, fairness, integrity, and fidelity, and if he does not he is strictly liable or accountable to his client." Also pertinent in this connection is the statement in *In re Stuart*, 257 Ala. 184, 57 So.2d 874, where in reviewing the Alabama grievance committee's action in suspending an attorney the court said, at p. 875: "In considering the question, we are not dealing with legal niceties, but the measure of good faith to be accorded by an attorney to his client and whether he has properly demeaned himself toward those high standards and trusts which inhere in his calling. Decision is not to be gauged by technical accuracies. The standard of ethics required of him is of a much higher character than is required in customary business dealings, where the parties deal at arm's length."

We think canon 11 is directly applicable and that it

was breached by respondent. Certainly his action in repudiating the fee agreement and placing his client in a position where he later could claim or attempt to claim that her acceptance of his check constituted an accord and satisfaction was a gross violation of "his duty to exercise the utmost honesty, good faith, fairness, integrity, and fidelity" to his client.

Further, even if it were possible to accept respondent's contention that what is involved here is but a bona fide dispute between attorney and client over the amount of the fee, we think respondent's conduct would still be unprofessional and censurable.

The amount in dispute between respondent and his client was only $2,000.00. That was, under any view of the evidence, all that he could with propriety have withheld from her. Acting in good faith he should therefore have given her the $26,000.00 without conditions, expressed or implied, and with the understanding that settlement of their dispute over the amount would be left open for future determination. "* * * A claim by an attorney to a part of the sum in hand does not excuse his failure to pay over promptly to his client the part as to which there is no claim." *In re Kraus,* 322 Pa. 362, 185 Atl. 737, 739. "The mere disagreement on such matters [costs and attorney's fees] will not justify the retention by an attorney of the whole sum collected. In such a case he may remit to his client all over and above the disputed part, and thus avoid any suggestion of bad faith. * * *" *Denny* v. *Commonwealth,* 175 Ky. 357, 194 S.W. 330, 333.

In extending the argument that the record reveals only a dispute over a fee, respondent now urges that he was entitled, irrespective of any modifying agreement with Mrs. Abrams, to a fee in excess of 30% because, as a matter of law, he was not required to bear the burden of the compensation to be paid associate counsel. *Lipscomb's*

*Adm'r* v. *Castleman,* 147 Ky. 741, 145 S.W. 753, and *Townsend* v. *Rhea,* 18 Ky. L. Rep. 901, 38 S.W. 865, are cited in support of the proposal. While these cases, and the principle for which they are cited, might have application if the question of the complainant's right to the $2,000.00 in dispute were in issue in a civil suit, they can have no bearing in this proceeding. Civil liability is not determinable and has no effect in disciplinary proceedings. *Bennett* v. *The State Bar,* 27 Cal.2d 31, 162 P.2d 5; *In re Tanz,* 233 App. Div. 300, 252 N.Y. Supp. 769; *People ex rel. Healy* v. *Allen,* 244 Ill. 393, 91 N.E. 463; *In re Egan,* 36 S.D. 228, 154 N.W. 521; *In re Maloney,* 35 N.D. 1, 153 N.W. 385. A further and full answer to respondent's contention is that he did not represent to his client or claim at the time the dispute between them arose that he was demanding the additional allowance to take care of Mr. Alexander's fee. The gravamen of his defection is his repudiation of the original fee agreement with his attending effort and success in having her accept his tender to her possible disadvantage.

Finding, as we do, that Mrs. Abrams' charge has been sustained, disciplinary action is in order unless any of the other contentions made by respondent requires a dismissal of the charge or a remand of the matter for a new hearing before the commissioners.

Another ground upon which respondent urges that the charge against him should be dismissed is based on the contention that rule 16 is invalid and that therefore the proceedings against him thereunder were null and void.

Rule 16 provides for reference to and a hearing by the commissioners appointed thereunder on charges of unprofessional conduct by attorneys of the bar. It contemplates and provides for a full hearing before the commissioners who, at the conclusion thereof, are required

to submit a report to the court. If the commissioners find the attorney guilty of unprofessional conduct, he has a right to contest the finding by filing exceptions to the report in this court. The review by this court is on the record alone. There is no trial de novo, as was expressly provided for in our rule governing disciplinary proceedings before the adoption, in 1955, of the present rule 16. (See old rule 19 set out. in 39 Haw. at p. 707.)[3] It is by reason of this lack of de novo hearing in this court that respondent urges that rule 16 is invalid. It is contended that the rule provides for an invalid delegation of the court's judicial duty and power, contrary to the provisions of R.L.H. 1955, § 217-1, reading: "* * * The supreme court shall have the sole power to revoke or suspend the license of any such practitioners or to dismiss or suspend them from the roll of practitioners for malpractice, fraud, deceit or other gross misconduct."

The power to regulate the admission to practice and disbarment or disciplining of attorneys is judicial in nature and is inherent in the courts. *In re Bouslog-Sawyer, supra,* 41 Haw. 403; *Ex parte Thompson,* 228 Ala. 113, 152 So. 229; *Hertz* v. *United States,* 8 Cir., 18 F.2d 52; *In re Patterson,* 9 Cir., 176 F.2d 966; 7 C.J.S., *Attorney and Client,* § 18, p. 728. Subject to the limitation that the essential elements of notice and opportunity to be heard must be preserved, the court may prescribe such procedure in disciplinary proceedings that it deems appropriate. The primary power in that respect rests with the court and not the legislature. *In re Keenan,* 313 Mass. 186, 47 N.E.2d 12; *In re Gorsuch,* 113 Kan. 380, 214 Pac. 794. If § 217-1 could be construed, as respondent

---

[3] Rule 16 is patterned after the draft of Model Rules of Court for Disciplinary Proceedings prepared by a committee of the American Bar Association. See 81 A.B.A. Rep. 482 (1956).

contends, to limit our supervisory authority over practicing attorneys and to limit our power to prescribe the procedure to govern disciplinary proceedings, we would be confronted with the delicate task of determining the validity of the statute. However, we perceive no conflict between § 217-1 and rule 16.

The limitation in § 217-1 relied on by respondent is the provision placing *"the sole power* to revoke or suspend" an attorney's license in this court. The commissioners are not vested with that power under rule 16. They are authorized only to make a recommendation to the court in that respect. Since the power to suspend or revoke an attorney's license rests exclusively with and is exercisable only by this court there is not, as respondent contends, a delegation of judicial power to the commissioners under the rule. *In re Platz,* 60 Nev. 296, 108 P.2d 858; *Phipps v. Wilson,* 7 Cir., 186 F.2d 748; *In re Donaghy,* 393 Ill. 621, 66 N.E.2d 856.

The procedure prescribed by rule 16 is very practical. Proceedings under the new rule are much more convenient to the court and to all parties concerned in a disciplinary hearing than the formerly existing practice of trying disciplinary proceedings anew in this court. The accused attorney's rights are adequately protected. He has full opportunity to be heard and to make his record before the commissioners. Under the new rule he is given ample opportunity in this court to challenge the charge and the findings of the commissioners on that record. We are of the opinion that the limited delegation to the commissioners under rule 16 of authority to investigate, report and make an advisory recommendation does not offend anything contained in § 217-1, and that the procedure prescribed by the rule is valid. See *In re Roth,* 398 Ill. 131, 75 N.E.2d 278; *Montgomery Co. B. Ass'n v. Rinalducci,* 329 Pa. 296, 197 Atl. 924; *People ex rel. Karlin v.*

*Culkin,* 248 N.Y. 465, 162 N.E. 487; *In re Petersen,* 208
Cal. 42, 280 Pac. 124; *In re Goldstone,* 214 Cal. 490, 6
P.2d 513; *McVicar* v. *State Board of Law Examiners,*
W.D. Wash., 6 F.2d 33.

The exception particularly stressed by respondent is
his exception No. 1 reading as follows:

"That in the proceedings upon which the report is
founded the respondent was denied due process of law
in that he was not (a) furnished with a copy of the com-
plaint prior to the commencement of the proceedings,
(b) given an opportunity to object to the charges as pro-
vided in rule 16,(c),(5)[4] of this Court, (c) advised as
to the nature of the tribunal before which he appeared or
the source of its authority and consequently and to his
prejudice did not know until almost the close of the pro-
ceedings that it was a fact finding body."

The commissioners' report, filed in this court on No-
vember 6, 1958, was placed on secret file. While it was on
secret file respondent moved to dismiss the charge against
him on the grounds which closely parallel those of the
exception now being considered. The then existing terri-
torial supreme court, after a hearing on the motion, de-
nied it in an unpublished opinion filed on January 27,
1959. The ruling of the court was as follows:

"Respondent seeks dismissal of the proceedings on
the ground that no complaint has been filed in accord-
ance with the provisions of rules 16(c)(3) and (4).
He states other grounds for dismissal, but we need
not consider them here because they are matters that
may be covered in the exceptions to the report.

"Rule 16(c)(3) provides: 'Any private person
acting through an attorney at law, or the Attorney
General, or the Bar Association of Hawaii (herein-

---

[4] The specifications of error and the argument show that the rule
intended to be referred to is rule 16(c)(4).

after called the "Bar Association") may, with the consent of the commissioners, file a complaint and prosecute the same.' The portion of rule 16(c)(4), pertinent to the instant motion, provides: 'A complaint must be signed by the person or persons aggrieved or by the President or Secretary of the Bar Association, or by the Chairman of the Committee on Inquiry. The charges must be sufficiently clear and specific reasonably to inform the respondent of the misconduct charged.'

"Respondent's position appears to be that complainant's letter is not a proper complaint under rule 16(c)(3) because it has not been filed and prosecuted by the complainant acting through an attorney at law, or the attorney general, or the Bar Association of Hawaii, with the consent of the commissioners.

"Under respondent's construction of rule 16(c)(3), a private person may not file and prosecute a complaint personally. The rule does not have such restrictive effect. It is a provision which permits representation of a private complainant in a disciplinary proceeding by an attorney at law, the attorney general or the Bar Association, not a provision which requires such representation.

"Under rule 16(c)(1) complaint must be written. Under rule 16(c)(2) complaint may be formal or informal; the rule also permits the commissioners to institute an investigation upon oral information. The provisions in rule 16(c)(4) regarding the signing of a complaint by the chairman of the committee on inquiry covers the situation where such complaint is the result of investigation made on oral information.

"A complaint meets the requirements of rule 16 if it is written and is sufficiently clear and specific reasonably to inform respondent of the misconduct

charged. Respondent did not object to the complaint at the hearing before the commissioners on the ground that it was not sufficiently clear and specific. He submitted to the hearing and, at its conclusion, presented to the commissioners a memorandum reviewing the evidence and setting forth his argument as to the law applicable to the proceeding. He may not now say that he was not reasonably informed of the misconduct charged or that he did not have a fair hearing.

"The motion, as to dismissal of the proceeding and, in the alternative, for remand to the commissioners, is denied. The matter will be placed in open file and respondent shall have twenty days from date to file his exceptions to the commissioners' report."

While the respondent's exception No. 1 and the argument presented on it to some extent amplify the grounds urged for dismissal, we do not consider any difference between the issues presented by the motion and those by the exception to be of a fundamental nature. The disposition of the motion to dismiss therefore obviates the necessity of any further consideration of exception No. 1.

Another contention made by respondent is that the commissioners' report should be set aside and the matter sent back to the commissioners for a new hearing for the alleged reason that Commissioner Heaton L. Wrenn was disqualified from sitting on the hearing of the charge.

It appears from the record that some time before respondent was retained by Mrs. Abrams she had consulted Mr. Martin Anderson, a junior associate in the commissioner's law firm, with the view only of attempting to recover the loss of earnings and other out-of-pocket expenses. Mr. Anderson arranged with the insurance carrier responsible to handle the matter directly with Mrs. Abrams as a routine claim. As that was all Mrs. Abrams wanted at the time, Mr. Anderson then bowed out of the

picture. The matter was closed as far as the commissioner's firm was concerned by its bill to complainant for services rendered in the amount of $20.00.

In respondent's opening brief it is contended that Mr. Wrenn was disqualified from sitting by virtue of canon 26 of the Canons of Judicial Ethics, and particularly under the provision thereof reading: "It is desirable that he [a judge] should, so far as reasonably possible, refrain from all relations which would normally tend to arouse the suspicion that such relations warp or bias his judgment, or prevent his impartial attitude of mind in the administration of his judicial duties." In his reply brief, reliance is placed upon the provisions of § 84 of the Organic Act (effective at the time of the hearing), declaring that no person shall sit as a judge in any case in which he has been "of counsel." We think it clear that each of these provisions is applicable only to one sitting in a true judicial capacity, and that neither has any application here.

There is no question but that an attorney being tried by a committee such as is set up under rule 16 is entitled to one whose members are free from any personal bias or prejudice against the accused attorney. A fair trial by an impartial tribunal is essential to due process. *In re Schlesinger,* 404 Pa. 584, 172 A.2d 835. If Mr. Wrenn were disqualified, it would necessarily have been by reason of something that occurred in the transient relationship between his firm and Mrs. Abrams which, as a matter of fact, rendered him biased and prejudiced against the respondent. There is nothing in the record which has the slightest tendency to warrant that conclusion. The character of Mr. Anderson's service in behalf of Mrs. Abrams had no relation whatsoever to the subsequent matters which gave rise to the cause here in issue. Further, it was conceded by respondent's counsel on oral argument that

the matter of Mr. Wrenn's disqualification presents no jurisdictional question. Consequently the objection to the commissioner sitting on the hearing was one which could be waived. The record shows that it was definitely and knowingly waived by respondent at the hearing.

Mr. Wrenn had forgotten the part his firm had acted in the original negotiation for the settlement of the complainant's claim, until his attention was directed to the matter by consideration of a memorandum in evidence, prepared by Mr. Anderson covering his brief dealings with Mrs. Abrams. The commissioner immediately apprised respondent of his discovery and indicated he would withdraw from the hearing if that was deemed necessary and proper. We need not extend the colloquy in the record since we conclude that Mr. Trask's waiver of any purported disqualification of Mr. Wrenn, and his willingness to proceed with the commissioner sitting, is sufficiently shown by excerpts from the transcript of statements made by him, as follows:

"Yes. Well, the question is this—I don't—I hesitate and don't wish to raise the question of disqualification—this is kind of new to me, and as I say, it was altogether—.

\* \* \*

"Well, as I say, if she hadn't brought it up,[5] I would not have raised it at all.

\* \* \*

"I don't know whether this disqualification comes in or not, but Mr. Wrenn was interested in the thing and he talked about it and this is just so there would be no—the way I looked at it, why, it was said for some purpose and it has been allowed to stay in. I

---

[5] This has reference to the fact Mrs. Abrams had testified that while she told Mr. Anderson she did not want to and had no intention of suing, she asked him what his contingent fee would be "should we sue and go to court," and was told it would be 30% of recovery.

mean if you feel that there is no disqualification, let's proceed. I mean I don't want to hold this thing up at all—my purpose is not to hold it up, but since you were anxious about it, I wanted that cleared up."

We pass over the question of whether or not the respondent should have raised the question of Mr. Wrenn's disqualification prior to commencement of the hearing. See *In re Davis,* 15 Haw. 377. From the foregoing, it is certain that during the hearing he was given the opportunity to press for disqualification of Mr. Wrenn and that he not only failed to do so but expressly indicated his willingness to proceed notwithstanding the fact Mr. Wrenn's firm had been previously consulted on Mrs. Abrams' claim. Under the circumstances, it is too late now to contend that the commissioner was disqualified or that respondent was prejudiced by Mr. Wrenn's sitting on the hearing. See *In re Bouslog,* 41 Haw. 270, 274 .

There are many subsidiary points raised and argued by respondent. We have considered them all, and find none to have sufficient merit to warrant separate treatment. None is of a fundamental nature. Notwithstanding any procedural deviations, respondent was fully aware from the very inception of the hearing of exactly what he was called upon to refute. He was allowed almost unrestricted leeway by the commissioners in examining witnesses and in presenting his case. He took full advantage of the opportunity. He has been represented in this court by able counsel who have gone over the record with a finetooth comb and have left little unsaid on his behalf. It is inconceivable that on a new hearing anything pertinent or material could be presented that was not presented before. Nothing has been presented to warrant our believing that there exists any likelihood that a new hearing might produce a different result. It is long past the time for closing the book in this matter. For all concerned,

*Robert W. B. Chang* and *Howard K. Hoddick* (*O. Vincent Esposito* and *Hoddick, Rothwell & Chang* on the briefs) for respondent.

*Shiro Kashiwa,* Attorney General, and *Yoshio Shigezawa,* Deputy Attorney General, contra.